OPINION OF THE COURT
 

 Fuchsberg, J.
 

 In an article 78 proceeding to review a determination of the State Tax Commission which sustained corporate franchise taxes imposed pursuant to article 9-A of the Tax Law, we are called upon to pass on the constitutionality of New York statutes which tax income emanating from the earnings of a “domestic international sales corporation” (hereinafter referred to by the acronym “DISC”), a class of corporations newly made eligible for preferential tax treatment by the Federal Revenue Act of 1971.
 

 
 *369
 
 The primary requirement for qualification as a DISC is that a corporation must derive at least 95% of its income from export sales and related services. The tax advantages it receives are intended to encourage the export of goods manufactured in the United States by compensating for the far lower taxes many foreign subsidiaries of American companies pay to the nations in which they operate (see H Rep No. 92-533, 92d Cong, 1st Sess [1971], reprinted in US Code Cong & Admin News, 1971, pp 1825, 1872; Sen Rep No. 92-437, 92d Cong, 1st Sess [1971], reprinted in US Code Cong & Admin News, 1971, pp 1918,1928,1996). To effect the contemplated tax benefit, the implementing statute, besides exempting a DISC from Federal taxation, permits half of its income to be “accumulated” without subjecting its shareholders to current Federal taxes. On the other hand, the other half is “deemed distributed” to the shareholders even if it in fact is not paid out as a dividend (see US Code, tit 26, § 991
 
 et seq.).
 

 [1]
 

 The DISC involved in the present proceeding, a Delaware corporation named Westinghouse Electric Export Corporation, is a wholly owned subsidiary of Westinghouse Electric Corporation (Westinghouse), a Pennsylvania corporation which does business in New York. It is undisputed that all of the DISC’S business income for 1972 and 1973, the years under review here, was earned as commission agent for either Westinghouse or the latter’s affiliates.
 
 [2]
 
 Moreover, it is agreed that none of the usual incidents of a nexus with New York applied to the DISC, it having operated no office, engaged no employees, conducted no business activities, employed no capital and neither owned nor leased real or tangible personal property. Concordantly, it did not file New York franchise tax returns.
 

 It was against this background that, when Westinghouse filed its own 1972 and 1973 New York franchise tax returns, though it included its “deemed distributions” from the DISC in its “entire net income” (see Tax Law, § 208, subd 9, par [a], cl [1]), it did not charge itself with any portion of
 
 *370
 
 the “accumulated” DISC income. Finding these returns deficient, New York State’s Department of Taxation and Finance took the position that Westinghouse, in its treatment of the DISC income, had failed to comply with section 208 (subd 9, par [i], cl [B]) of the Tax Law, which, in essence, requires a reporting corporation to compute its “entire net income” by consolidating its DISC’S receipts, expenses, assets and liabilities with its own, save for transactions between it and its DISC.
 

 Such consolidation, of course, would have added the accumulated DISC income which had been deferred for Federal tax purposes.
 
 [3]
 
 Against the deficiency assessed on this basis, the department did allow Westinghouse a DISC export credit for merchandise “shipped from a regular place of business of the taxpayer within this state”, all pursuant to a formula set out in section 210 (subd 13, par [a]) of the Tax Law (see
 
 infra,
 
 p 375).
 

 In its petition for a redetermination, Westinghouse alleged that inclusion of accumulated DISC income in its “entire net income” would impose an undue burden on interstate and foreign commerce (US Const, art I, § 8, cl 3)
 
 [4]
 
 ; that, in violation of the due process clauses of the State and Federal Constitutions, New York lacked a jurisdictional nexus upon which to tax the DISC’S income; and that, if the DISC’S accumulated income had to be included in “entire net income”, section 210 (subd 13, par [a]) of the Tax Law, which provides the tax credit, offends the com
 
 *371
 
 merce clause because it discriminates against shipments of export property from locations outside the State. In addition, Westinghouse, asserting that State taxation of the deemed distributions of DISC trespassed on due process and equal protection, demanded that the taxes it had paid on such be refunded.
 
 [5]
 
 The State Tax Commission rejected all of these contentions.
 

 For its part in this proceeding, the Appellate Division, two Justices dissenting, found that section 208 (subd 9, par [i], cl [B]), in requiring the DISC’S accumulated income to be added to the taxpayer’s “entire net income”, constituted an unconstitutional imposition on foreign commerce. Having found that section 208 (subd 9, par [i], cl [B]) violated the commerce clause, the court did not address Westinghouse’s claim that the provision was also invalid for lack of due process. Nor did the court decide the constitutionality of the tax credit of section 210 (subd 13, par [a]), apparently because this section expressly is made dependent on the validity of section 208 (subd 9, par [i], cl [B]). Finally, it rejected Westinghouse’s due process and equal protection contentions regarding the inclusion of the deemed distribution income. For the reasons which follow, we believe none of the constitutional objections has merit.
 

 Turning at once to Westinghouse’s primary argument — that the addition of the accumulated DISC income to Westinghouse’s “entire net income” as called for by section 208 (subd 9, par [i], cl [B]) of the Tax Law frustrates the efficacy of the Federal tax incentive and, therefore, runs counter to the fundamental policy dictates of the commerce clause — we first pay heed to the well-settled proposition that the ultimate power to regulate both foreign and interstate commerce lies with Congress (see, e.g.,
 
 Gibbons v Ogden,
 
 9 Wheat [22 US] 1, 86-87). However, that a State chooses to act in the same field as does Congress does not . automatically portend judicial nullification of the State law (see
 
 Walhalla Assoc. v National Commercial Bank & Trust Co.,
 
 54 NY2d 857; see, generally, Tribe, American
 
 *372
 
 Constitutional Law, § 6-24, p 379). It all hinges on whether Congress intended to pre-empt State regulation (see Rice
 
 v Santa Fe Elevator Corp.,
 
 331 US 218, 229-230).
 

 This said, we note that in the present case there is no explicit statement of pre-emption. Nor does the statutory scheme imply any such design. True, it bespeaks a plan to give special tax treatment to DISC’S and their stockholders in order to encourage export sales of goods manufactured in the United States. But that some benefits were extended to accomplish this end does not mean that every possible kind was intended. To the contrary, even as to Federal taxation, the incentives tendered a DISC’S shareholders, the ultimate beneficiaries of a DISC’S tax preferment, are far more limited than those offered to the DISC per se.
 
 [6]
 

 Most persuasive is the relevant legislative history. This leaves little to implication. On September 8, 1971, shortly before the DISC legislation was enacted, John S. Nolan, Deputy Assistant Secretary of the Treasury for Tax Policy, spokesman for the sponsoring department, in the company of then Secretary of Treasury John B. Connally, officially appeared at a hearing before the Committee on Ways and Means of the House of Representatives. There, Mr. Nolan, in response to an expression of committee concern that the proposal might “prohibit States from levying corporate income taxes on a DISC”, was unequivocal in his declaration that the proposed bill would leave the States “free to impose the tax, if they choose to do so” (see Hearings before House Committee on Ways and Means on the Tax Proposals Contained in the President’s New Economic Policy, 92d Cong, 1st Sess, Part I, pp 170-171). Moreover, not without significance, proposed legislation which might have preempted the States from taxing DISC’S was considered by the same committee in 1980, only to be permitted to die without any action (see H Rep No. 5076, 96th Cong, 2d Sess; Hearing before Committee on Ways and Means on State Taxation of Foreign Source Income, pp 29, 326). Overall, then, our State is far from constrained by a clear
 
 *373
 
 statement that Congress intended to exercise its commerce power in full (see Tribe, American Constitutional Law, § 5-8, p 243).
 

 On this point, comments also are in order on
 
 McGoldrick v Gulf Oil Corp.
 
 (309 US 414) to which Westinghouse adverts to support its position. There, a Federal statute permitted the importation of crude petroleum into the United States free of import duty. However, the statute specified that the petroleum be imported, converted into fuel oil and then sold solely for fuel in propelling foreign-bound vessels in foreign commerce, all while in bond. These
 
 congressionally designed
 
 conditions prevented the segregated oil from ever becoming a part of “the common mass of property in the state”
 
 (McGoldrick, supra,
 
 at p 423). The Supreme Court emphasized that it was this integrated structure for assuring that the oil, never left the stream of foreign commerce, which has no parallel in this case, that compelled the conclusion that “while in bonded warehouse, [the oil is] free from state taxation”
 
 (McGoldrick, supra,
 
 at pp 428-429).
 

 The second prong of Westinghouse’s constitutional attack on section 208 (subd 9, par [i], cl [B]) is that, since neither the DISC nor any of Westinghouse’s affiliates for which it acted as export commission agent were engaged in business in New York, the State lacked the jurisdictional nexus to satisfy the minimal due process standards on which the right to tax must be predicated. We find this assertion equally without merit. Revealing in this connection is the recent decision in
 
 Mobil Oil Corp. v Commissioner of Taxes
 
 (445 US 425). In the context of a challenge to Vermont’s taxation of dividend income received by a taxpayer from foreign subsidiaries and affiliates, the court reminded us that in such a case, due process mandates can be met by a State’s apportionment formula so long as it is reasonably designed to reflect the percentage of a unitary business’ profits connected with the State (see
 
 Mobil Oil, supra,
 
 at pp 436-440; cf.
 
 American Ins. Assn. v Lewis,
 
 50 NY2d 617, 623-624).
 

 Here the record shows that Westinghouse and its DISC were operating a unitary business. Not all the accumu
 
 *374
 
 lated DISC income was subjected to taxation, but rather only that part allocable to New York (Tax Law, § 208, subd 9, par [i], cl [B]; § 210, subd 1, par [a]; § 210, subd 3; cf.
 
 Matter of Fischbach & Moore v State Tax Comm.,
 
 36 NY2d 605, 607). Moreover, there is nothing in the record to show that the income was improperly apportioned to business done in New York; nor does the taxpayer question our State’s allocation formula.
 
 [7]
 

 This brings us to the Westinghouse argument that, even if the inclusion of the accumulated DISC income required by section 208 (subd 9, par [i], cl [B]), standing alone, does not contravene the commerce clause, an infringement occurs when it is acted upon by the tax credit provided for in section 210 (subd 13, par [a]). It reasons that the effect of the credit is impermissibly to subject its export sales from a non-New York “place of business” to a higher rate of tax than comparable sales “shipped from a regular place of business” within New York.
 

 The credit was devised, by the State on its own, to provide shareholders of DISC’S with State tax incentives akin to those which had been enacted by the Federal Government (see Letter from Norman F. Gallman, Comr of Taxation and Finance to Governor Nelson A. Rockefeller in Bill Jacket [at p 3-4] of L 1972, ch 778; Memorandum of Dept of Commerce in Bill Jacket [at p 12] of L1972, ch 778; Division of Budget Report in Bill Jacket [at p 19] of L 1972, ch 778). Such credit was intended to ensure that New York would not lose its competitive position vis-á-vis other States which were also expected to offer tax benefits to DISC owners (see Letter from Arthur M. Arnold, Director of Taxation and Governmental Affairs of Empire State Chamber of Commerce in Bill Jacket [at p 28] of L 1972, ch 778; Memorandum in Support by New York Chamber of Commerce in Bill Jacket [at p 29] of L 1972, ch 778). While Congress chose to provide the benefit in the form of a tax deferral, our State Legislature elected to use a tax credit.
 

 
 *375
 
 That a State’s tax structure is so used hardly requires an
 
 ipso facto
 
 finding that we have discriminated against multistate enterprises in favor of intrastate corporations. Rather, States are free to use their taxing power “to encourage the growth and development of intrastate commerce and industry * * * [and to] compete with other States for a share of interstate commerce; such competition lies at the heart of a free trade policy”
 
 (Boston Stock Exch. v State Tax Comm.,
 
 429 US 318, 336-337). That this is what the credit allowed by section 210 (subd 13, par [a]) accomplishes, and no more, is demonstrated by a review of how it is calculated.
 

 The first step to be taken to arrive at the amount of such tax credit is to multiply the taxpayer’s share of the accumulated DISC income by the taxpayer’s New York “business allocation percentage” (Tax Law, § 210, subd 3). This yields the dollar value of the accumulated DISC income allocable to New York as
 
 in-State
 
 earnings. This amount is then multiplied by that percentage which the taxpayer’s receipts from export property on which the DISC earned commissions
 
 and
 
 which was shipped from a regular place of business in New York bears to the taxpayer’s total receipts from the sale of export property on which the DISC earned commissions. The product of this calculation is the amount eligible for the credit; it is merely a subdivision of the accumulated DISC income allocable to New York.
 
 [8]
 

 Obviously, the business allocation percentage plays an integral role in computing the tax credit. It determines what amount of the taxpayer’s income has a jurisdictional nexus with the State. The result is that, when the State exercises its taxing power, it does so consistently with due process mandates
 
 (Northwestern Cement Co. v Minnesota,
 
 358 US 450;
 
 Wisconsin v Penney Co.,
 
 311 US 435).
 

 
 *376
 
 But New York need not tax all it has the right to tax. The credit here simply forgives a portion of that income which New York may tax by reference to shipments of export property from a regular place of business in New York, an additional New York relationship. Such a method clearly satisfies due process, and any effect on interstate commerce is too indirect to run afoul of the commerce clause.
 

 Now, having disposed of the arguments on which Westinghouse seeks to overturn the Tax Commission’s assessment, we treat with its claim for reimbursement of its allegedly mistaken paymept of tax on the deemed distributions. Its position, again cast in constitutional terms, is that taxation of such income infringes upon both due process and equal protection.
 

 This due process position is no different from the one it took regarding taxation of accumulated DISC income, i.e., New York lacks a sufficient nexus with the DISC to tax its income. But, since Westinghouse and the DISC are parts of a unitary business and there is an apportionment of the income allocable to New York, there is no due process violation
 
 (Mobil Oil Corp. v Commissioner of Taxes,
 
 445 US 425,
 
 supra).
 

 As for equal protection, Westinghouse would have us hold that, since New York law provides that the income from all non-DISC subsidiaries is exempt from the State’s franchise tax (Tax Law, § 208, subd 9, par [a], cl [1]), it is irrational to tax it on the deemed distribution income of its wholly owned DISC subsidiary (Tax Law, § 208, subd 8-A, par [b]). But, if the DISC had not elected to be treated as a domestic international sales corporation, the intercompany transactions in which it engaged would have compelled the commissipn to require it and Westinghouse to file a combined report (see Tax Law, § 211, subd 4). In that event, the allocated income of the DISC would be combined with the allocated income of Westinghouse (see
 
 Matter of Wurlitzer Co. v State Tax Comm.,
 
 35 NY2d 100). As the Appellate Division correctly observed, "[tihere is nothing in the record to indicate that petitioner’s tax liability resulting from a combined report * * * would be less than that which was in fact imposed” (82 AD2d 988, 989).
 

 
 *377
 
 For all these reasons, the judgment of the Appellate Division should be modified by reinstating the determination of the State Tax Commission.
 

 Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur.
 

 Judgment modified, with costs to the State Tax Commission, in accordance with the opinion herein and, as so modified, affirmed.
 

 [1]
 

 . Since no questions are raised as to the tax ramifications of an actual distribution of DISC income or the eventual taxability of the accumulated DISC income, we do not treat with such issues in this opinion. *
 

 [2]
 

 . None of the affiliates did business in New York.
 

 [3]
 

 . Section 208 (subd 9, par [i], cl [B]) of the Tax Law, ip pertinent part, reads: “[A]ny taxpayer required to compute a tax under this article, which during the taxable year being reported was a stockholder in any DISC * * * shall * * * adjust each item of its receipts, expenses, assets and liabilities, as otherwise computed under this article, by adding thereto its attributable share of each such DISC’S receipts, expenses, assets and liabilities *** provided, however, (1) that all transactions between the taxpayer and each such DISC shall be eliminated from the taxpayer’s adjusted receipts, expenses, assets and liabilities; (2) that the taxpayer’s entire net income as otherwise computed under this section, shall be reduced by subtracting the amount of the deemed distribuí tion of cprrent income, if any, from each such DISC already included in the entire net income of such taxpayer by virtue of having been included in its entire taxable income for that taxable year as reported to the United States Treasury Department”.
 

 [4]
 

 . The commerce clause provides that “The Congress shall have Power * * * To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes”.
 

 [5]
 

 . Westinghouse also contended that the State Tax Commission had transposed certain numbers creating an arithmetical miscalculation of the tax. In its answer, the commission conceded this error.
 

 [6]
 

 . We also observe that even accumulated DISC income is taxable to the shareholders when it is distributed, when a shareholder sells his stock or when the corporation no longer qualifies as a DISC (see US Code, tit 26, § 995).
 

 [7]
 

 . Subdivision 3 of section 210 of the Tax Law provides for an allocation of a taxpayer’s total business income from all sources by the application of a three-factor formula, the three factors being the fractions represented by a taxpayer’s property within New York over all its property, a taxpayer’s payroll within New York over its total payroll and a taxpayer’s receipts from within New York over its total receipts.
 

 [8]
 

 . The dollar value of the credit is then determined by multiplying the amount available for the credit by 70% and then by the tax rate (Tax Law, § 210, subd 13, par [a]). According to a memorandunj prepared by the State Department of Commerce before the DISC legislation was enacted “[t]he 70 percent factor included in the export credit formula [was] apparently designed to minimize revenue loss while still providing some tax incentive for the export business” (Memorandum of Dept of Commerce in Bill Jacket [at p 12] of L 1972, ch 778).